UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| CHRISTOPHER MICHAEL SMARDZ, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case # 1:19-cv-1035-DB |
| | § | |
| COMMISSIONER OF SOCIAL SECURITY, | § | MEMORANDUM DECISION |
| | § | AND ORDER |
| Defendant. | § | |

## INTRODUCTION

Plaintiff Christopher Michael Smardz ("Plaintiff") brings this action pursuant to the Social Security Act (the "Act"), seeking review of the final decision of the Commissioner of Social Security (the "Commissioner"), that denied his application for Disability Insurance Benefits ("DIB") under Title II of the Act, and his application for supplemental security income ("SSI") under Title XVI of the Act. *See* ECF No. 1. The Court has jurisdiction over this action under 42 U.S.C. §§ 405(g), 1383(c), and the parties consented to proceed before the undersigned in accordance with a standing order (*see* ECF No. 14).

Both parties moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). *See* ECF Nos. 9, 11. Plaintiff also filed a reply brief. *See* ECF No. 13. For the reasons set forth below, Plaintiff's motion for judgment on the pleadings (ECF No. 9) is **DENIED**, and the Commissioner's motion for judgment on the pleadings (ECF No. 11) is **GRANTED**.

## BACKGROUND

Plaintiff protectively filed his applications for DIB and SSI on February 11, 2016, alleging disability beginning March 11, 2011 (the disability onset date), due to: "colon problems;" hernia; the effect of three surgeries, which required him to wear a girdle; "right leg issues" including pain; fibromyalgia; joint pain; and chronic pain. Transcript ("Tr.") 15, 207. The claims were denied

initially on May 23, 2016, after which Plaintiff requested an administrative hearing. Tr. 15, 115-132. On May 27, 2018, Administrative Law Judge Bonnie Hannan (the "ALJ") conducted a video hearing from Alexandria, Virginia. Tr. 15, 32-66. Plaintiff appeared and testified from West Seneca, New York, and was represented by Kenneth R. Hiller, an attorney. *Id*. Valerie Allen, an impartial vocational expert ("VE"), also appeared and testified at the hearing. *Id*.

The ALJ issued an unfavorable decision on August 30, 2018, finding that Plaintiff was not disabled. Tr. 15-27. On June 7, 2019, the Appeals Council denied Plaintiff's request for further review. Tr. 1-6. The ALJ's August 30, 2018 decision thus became the "final decision" of the Commissioner subject to judicial review under 42 U.S.C. § 405(g).

## LEGAL STANDARD

### I.   District Court Review

"In reviewing a final decision of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (citing 42 U.S.C. § 405(g)) (other citation omitted). The Act holds that the Commissioner's decision is "conclusive" if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence means more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (citations omitted). It is not the Court's function to "determine *de novo* whether [the claimant] is disabled." *Schaal v. Apfel*, 134 F. 3d 496, 501 (2d Cir. 1990).

### II.   The Sequential Evaluation Process

An ALJ must follow a five-step sequential evaluation to determine whether a claimant is disabled within the meaning of the Act. *See Parker v. City of New York*, 476 U.S. 467, 470-71 (1986). At step one, the ALJ must determine whether the claimant is engaged in substantial gainful

work activity. *See* 20 C.F.R. § 404.1520(b). If so, the claimant is not disabled. If not, the ALJ proceeds to step two and determines whether the claimant has an impairment, or combination of impairments, that is "severe" within the meaning of the Act, meaning that it imposes significant restrictions on the claimant's ability to perform basic work activities. *Id.* § 404.1520(c). If the claimant does not have a severe impairment or combination of impairments meeting the durational requirements, the analysis concludes with a finding of "not disabled." If the claimant does, the ALJ continues to step three.

At step three, the ALJ examines whether a claimant's impairment meets or medically equals the criteria of a listed impairment in Appendix 1 of Subpart P of Regulation No. 4 (the "Listings"). *Id.* § 404.1520(d). If the impairment meets or medically equals the criteria of a Listing and meets the durational requirement, the claimant is disabled. *Id.* § 404.1509. If not, the ALJ determines the claimant's residual functional capacity, which is the ability to perform physical or mental work activities on a sustained basis notwithstanding limitations for the collective impairments. *See id.* § 404.1520(e)-(f).

The ALJ then proceeds to step four and determines whether the claimant's RFC permits him or her to perform the requirements of his or her past relevant work. 20 C.F.R. § 404.1520(f). If the claimant can perform such requirements, then he or she is not disabled. *Id.* If he or she cannot, the analysis proceeds to the fifth and final step, wherein the burden shifts to the Commissioner to show that the claimant is not disabled. *Id.* § 404.1520(g). To do so, the Commissioner must present evidence to demonstrate that the claimant "retains a residual functional capacity to perform alternative substantial gainful work which exists in the national economy" in light of his or her age, education, and work experience. *See Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (quotation marks omitted); *see also* 20 C.F.R. § 404.1560(c).

## ADMINISTRATIVE LAW JUDGE'S FINDINGS

The ALJ analyzed Plaintiff's claim for benefits under the process described above and made the following findings in her August 30, 2018 decision:

1. The claimant meets the insured status requirements of the Social Security Act through June 30, 2015;

2. The claimant has not engaged in substantial gainful activity since March 11, 2011, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.);

3. The claimant has the following severe impairments: major depressive disorder; anxiety; hernias; irritable bowel disease; spine disorder; and hypertension (20 CFR 404.1520(c) and 416.920(c));

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926);

5. The claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a)[1] except he can frequently balance, occasionally stoop, kneel, crouch, crawl and climb ramps and stairs but can never climb ladders, ropes, or scaffolds. He can never work at unprotected heights or near moving mechanical parts. He can work near occasional vibration. After approximately 30 minutes of standing or walking, he must be able to sit for approximately one to five minutes but would remain on task, and after approximately 30 minutes of sitting must be able to stand for approximately one to five minutes but would  remain on task. He is limited to performing simple, routine, and repetitive tasks. He is limited to simple, work-related decisions and tolerating few changes in a routine work setting (defined as performing the same duties at the same station or location day to day). He can occasionally interact with supervisors and have occasional contact with coworkers with no tandem tasks or tern-type [sic] activities.  He cannot interact with the public;

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965);

7. The claimant was born on May 2, 1972 and was 38 years old, which is defined as a younger individual age 45-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963);

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964);

---

[1] "Sedentary" work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (*See* SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2);

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a);

11. The claimant has not been under a disability, as defined in the Social Security Act, from March 11, 2011, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. 15-27.

Accordingly, the ALJ determined that, based on the application for a period of disability and disability insurance benefits protectively filed on February 11, 2016, the claimant is not disabled under sections 216(i) and 223(d) of the Social Security Act. Tr. 27. The ALJ also determined that based on the application for supplemental security benefits protectively filed on February 11, 2016, the claimant is not disabled under section 1614(a)(3)(A) of the Act. *Id.*

## ANALYSIS

Plaintiff essentially asserts a single point of error. Plaintiff argues that the ALJ's residual functional capacity was insufficiently informed by medical opinion evidence because the ALJ failed to include all of the physical and mental limitations from the opinions in the RFC assessment, and therefore, she used her own lay opinion to formulate Plaintiff's RFC. *See* ECF No. 9-1 at 15-21.

The Commissioner argues in response that Plaintiff's argument is flawed because the ALJ is not limited to simply adopting a medical opinion to formulate the RFC, and it is the ALJ's role to formulate the RFC based on the record as a whole, which the ALJ did in this case. Accordingly, argues the Commissioner, the ALJ's decision was supported by substantial evidence. *See* ECF No. 11-1 at 16-26.

A Commissioner's determination that a claimant is not disabled will be set aside when the factual findings are not supported by "substantial evidence." 42 U.S.C. § 405(g); *see also Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000). Substantial evidence has been interpreted to mean "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. The Court may also set aside the Commissioner's decision when it is based upon legal error. *Rosa*, 168 F.3d at 77. Upon review of the record in this case, the Court finds that the ALJ properly considered the medical opinion evidence and the record as a whole to determine Plaintiff's RFC, and her finding that Plaintiff is not disabled is supported by substantial evidence.

Plaintiff had a history of treatment for hernia that predated the beginning of the relevant period, including colon and hernia surgeries, and bulging of his abdomen from the hernias. Tr. 274-80, 283, 302, 402-04, 422, 432-44, 436-38, 441-43, 467-68, 552, 803, 810. Plaintiff's first hernia examination during the relevant period was April 8, 2015, at WNY Medical, P.C. ("WNY Medical"), where he was seen by nurse practitioner Leslie Bixby ("Ms. Bixby"). Tr. 484. Ms. Bixby reported that Plaintiff's abdomen was asymmetric and protuberant, but it was otherwise normal. Tr. 482. She also reported that Plaintiff had moderately limited active range of motion in his spine, and he had psychological symptoms including mild agitation, "superficial" cooperation, anxiety, and loud and voluble speech. Tr. 482. Ms. Bixby diagnosed lower back pain, hernia, hypertension, depressive disorder, anxiety, insomnia, and rhinitis. Tr. 483-84.

On April 13, 2015, Ms. Bixby completed a medical source statement form for the New York State Office of Temporary and Disability Assistance. Tr. 1071-72. On the form, she indicated that Plaintiff was "very limited" in physical areas like his ability to walk, lift/carry, and push/pull/bend. *Id*. She endorsed a moderate limitation in standing/sitting and climbing. *Id*. In terms of mental functioning, Ms. Bixby indicated that Plaintiff had moderate limitations in his ability to understand and remember instructions, carry out instructions, maintain

attention/concentration, and work at a consistent pace. *Id*. She indicated that he did not have limitations in making simple decisions, interacting appropriately with others, maintaining socially appropriate behavior without behavior extremes, and maintaining basic standards of personal hygiene and grooming. *Id*. In a short narrative section of the form, she wrote that Plaintiff should avoid lifting over twenty pounds; limit himself to low stress work; avoid lifting, bending, twisting, sitting, or standing long periods; and avoid pushing and pulling. *Id*.

Plaintiff returned to WNY Medical about four months later, in mid-August 2015, complaining of the "usual issues." Tr. 475. Plaintiff's affect was reported as "anxious" and his speech was "loud and rapid." Tr. 477.  On physical examination, he had positive straight leg raise ("SLR") testing on the right; normal abdominal examination; and normal musculoskeletal examination, including 5/5 strength. Tr. 476.

Plaintiff saw Jafar Siddiqui, M.D. (Dr. Siddiqui"), on August 10, 2015, for complaints of back and right leg pain. Tr. 371. Dr. Siddiqui reported that Plaintiff was tender to palpitation in the lumbosacral spine, with limited range of motion over his lower back. Tr. 373. However, he retained normal strength and sensation in his arms and legs. Tr. 373. The doctor also observed that Plaintiff's mood and affect were pleasant and appropriate. *Id*. Dr. Siddiqui started Plaintiff on hydrocodone and scheduled an MRI of Plaintiff's lumbar spine. Tr. 374-75.

Plaintiff had the MRI in October 2015 and returned to see Dr. Siddiqui in November 2015. Tr. 376, 399-400. The MRI showed foraminal narrowing and central canal stenosis. Tr. 400. Dr. Siddiqui's examination was unchanged; he told Plaintiff to continue with his treatment and prescribed a pain injection for Plaintiff's back. Tr. 376-80. Plaintiff also returned to Dr. Siddiqui's office once in January 2016 and twice in March 2016, where he was seen by Ross Guarino, P.A. ("Mr. Guarino"), who reported findings similar to Dr. Siddiqui's, including tenderness, limited range of motion, positive SLR testing, and full and normal strength. Tr. 384-85, 389-90, 394-95.

On March 29, Mr. Guarino reported Plaintiff's gait was "mildly antalgic," but his examination was otherwise unchanged, including full strength. Tr. 394.

Plaintiff had a follow-up appointment at WNY Medical in mid-January 2016 with Nicole Wanser, NP ("Ms. Wanser"). Tr. 492-94. Plaintiff wanted to discuss changing his medications. Tr. 492. Plaintiff's physical examination was essentially unchanged, but he was "very nervous about meeting a new provider," and his blood pressure was elevated. Tr. 494. His affect was "anxious" and his speech was "loud and voluble." *Id*. Plaintiff reported he did not like how he felt on Seroquel, and he had stopped taking it on his own. *Id*.

In late February 2016, Plaintiff went to the Emergency Department ("ED") at Mercy Hospital in Buffalo, complaining of pain and throwing up. Tr. 887, 893. He appeared ill and uncomfortable, but his behavior was otherwise normal. Tr. 888-89. A CT scan of his abdomen and pelvis showed a partial small bowel obstruction that was possibly due to effusion. Tr. 902. The scan also showed Plaintiff's hernia, as well as post-surgical changes in the sigmoid colon and diverticulosis. *Id*. Plaintiff left against medical advice, and his condition was reported as "fair." Tr. 893.

Plaintiff returned to WNY Medical for routine visits in March, April, May, and June 2016, with clinical findings similar to earlier reports from the facility. Tr. 500-03, 526-29, 752-55, 776. Ms. Wasner wrote that Plaintiff's depression and anxiety were "well controlled" with the current medication regimen, but that he still tended to appear anxious, with "loud and voluble" speech. Tr. 502-03, 528, 752, 754, 760, 774. Also, in April 2016, Ms. Wasner wrote a letter stating that Plaintiff had a history of opioid dependency and use, and he wished to be weaned off. Tr. 770. The letter stated that Plaintiff was medically stable to be participate in a controlled treatment program. Tr. 770. During this same time, on April 7, 2016, a letter from New York Spine and Wellness Center (Dr. Siddiqui's practice) indicated that Plaintiff underwent a random urine drug compliance

screen had tested positive for a controlled substance that they had not prescribed. Tr. 716. The letter stated that Plaintiff would not receive further medications from their office. Tr. 716.

On May 12, 2016, Plaintiff saw consultative psychiatric examiner Janine Ippolito, Psy.D. ("Dr. Ippolito"), at the request of Social Security. Tr. 546-50. Plaintiff told Dr. Ippolito he was suffering from symptoms of depression like depressed mood, loss of usual interests, irritability, and social withdrawal. Tr. 547. He said he worried, had panic attacks, and did not like crowds. *Id*. Plaintiff denied previous psychiatric hospitalizations and reported he was not receiving any outpatient psychiatric treatment. Tr. 546. However, he reported he was getting psychotropic medications from his primary care doctor, which were "somewhat helpful" in managing his symptoms. Tr. 546. In terms of daily activities, Plaintiff told Dr. Ippolito he was able to take care of his own personal needs and do light cooking, but he did not do any other housework because his father took care of those tasks. Tr. 548. He reported he had friends but interacted with them infrequently, and he spent his day going for walks and watching television. Tr. 549.

Upon mental status examination, Plaintiff had normal social skills; he was cooperative; and he had adequate hygiene. Tr. 547. He was restless but had good eye contact, and normal speech. Tr. 548. Plaintiff's memory was "mildly impaired" due to distractibility. *Id*. Dr. Ippolito believed Plaintiff's attention and concentration were impaired due to possible difficulty with math skills; he could do most clinical tests normally, but he had difficulty with two-step math calculations. *Id*. He could remember three out of three objects immediately and two out of three after a delay; and he could also repeat four numbers forward and two backward. *Id*. His insight and judgment were fair. *Id*.

Dr. Ippolito diagnosed Plaintiff with major depressive disorder and opined that Plaintiff could follow and understand simple directions and instructions; perform simple tasks independently; maintain a regular schedule; learn new tasks; perform complex tasks

independently; and make appropriate decisions with no evidence of limitations. Tr. 549. Dr. Ippolito further opined that Plaintiff had moderate limitations in his ability to maintain attention and concentration, relate adequately with others, and deal with stress. *Id*. She noted that Plaintiff's limitations were due to his "emotional distress and distractibility." *Id*.

Also on May 12, 2016, Plaintiff had a consultative physical examination with David Brauer, M.D. ("Dr. Brauer"). Tr. 552. Plaintiff told Dr. Brauer that his abdominal problems had begun in 2011, when he had colon surgery for diverticulitis that required a colostomy bag, which was surgically reversed back to normal about a year later. *Id*. By 2014, he had developed a abdominal hernia, which had to be treated with a third surgery. *Id*. At the time of Dr. Brauer's examination, Plaintiff said he had chronic abdominal pain, but his diverticulitis had been stable, and he did not have gastrointestinal symptoms like vomiting, diarrhea, or constipation. *Id*. However, Plaintiff said since his last surgery, he had developed chronic back pain and a slight limp while walking. Tr. 552-53. Plaintiff told Dr. Brauer he could take care of his personal needs and cook with the microwave, and he mostly watched television in his free time. Tr. 554.

Dr. Brauer noted that Plaintiff was a poor historian, and that he "seem[ed] somewhat agitated" and "uncomfortable" during the examination. Tr. 554. Upon examination, Plaintiff had a slow gait, with a limp, and he could squat about fifty percent. *Id*. He also had a mild sensory deficit in his left leg. Tr. 555. However, he was able to get on and off the examining table without assistance, and he could rise from his chair without difficulty. Tr. 554. He had some forward curvature of his mid-spine, with limited range of motion, but he had negative SLR testing, normal range of motion, and normal strength. Tr. 555-56. Dr. Brauer diagnosed Plaintiff with chronic abdominal pain secondary to multiple surgeries, diverticulitis, chronic low back pain, chronic right leg pain, and hypertension; his long-range prognosis was stable. Tr. 556. Dr. Brauer opined that

Plaintiff had moderate limitations in his ability to stand, sit, push, pull, and carry heavy objects. *Id*.

On July 8, 2016, Ms. Wasner completed a New York state disability form similar to the form completed by Ms. Bixby in 2015. Tr. 1073-74. In terms of physical limitations, she indicated that Plaintiff was very limited in his ability to lift/carry, push/pull/bend, and climb stairs and moderately limited in walking, standing, and sitting. Tr. 1074. In terms of mental functioning, she stated that Plaintiff had a moderate limitation in all eight areas—understanding and remembering instructions, carrying out instructions, maintaining attention/concentration, making simple decisions, interacting appropriately with others, maintaining socially appropriate behavior without exhibiting behavioral extremes, maintaining basic standards of personal hygiene and grooming, and functioning in a work setting at a consistent pace. *Id*. In the narrative portion of the form, Ms. Wasner indicated that Plaintiff was to avoid lifting more than twenty pounds. *Id*.

On July 15, 2016, Plaintiff went to the ED at Mercy Hospital in Buffalo, complaining of pain in his abdomen and lower back and requesting stronger pain medication, Tr. 913. Plaintiff was described as "animated" and having a "very bizarre affect." Tr. 914. When asked any review of systems questions, he kept repeating, "there are blockages, I know my history." *Id*. Plaintiff's examination was normal, and he said he was having normal gastrointestinal functioning. *Id*. A CT scan of his abdomen and pelvis the next morning showed his hernia, but no blockages. Tr. 923.

Plaintiff returned to WNY Medical on July 27, 2016 for a routine visit and medication refills. Tr. 744-49. The treatment record states he was "still looking for pain management." Tr. 744. He reported "his depression and anxiety are mostly controlled, but [he] has flare ups depending on the day." *Id*. His examination was essentially normal, including his mood. Tr. 745-46. Plaintiff returned for two more visits, in September and November 2016. Tr. 728-37. He

reported variable depression and anxiety symptoms, but he also said that both conditions were controlled with treatment. Tr. 730-31.

Plaintiff continued to visit WNY Medical into 2017, with four visits between January and May 2017. Tr. 686-724. In March 2017, Plaintiff reported that he needed Tylenol to help tide him over until his next pain management visit. Tr. 709. His providers continued to report that Plaintiff's anxiety and depression were stable. Tr. 688, 712. In May 2017, he was noted to have refused a urine test and did not bring his medications for a count. Tr. 690. His examination was normal, except he "display[ed] ambivalence consistently during encounter and mania consistently during encounter;" his anxiety was no longer listed as stable; and he was to continue psychotherapy and counseling. Tr. 687-88.

On June 14, 2017, Plaintiff was seen by surgeon Kenneth Eckhert, III, M.D. ("Dr. Eckhert") regarding his hernias. Tr. 616-19. After discussing the benefits and risks of surgery, Plaintiff opted to undergo further open hernia surgery. Tr. 618. Plaintiff was cleared for surgery at WNY Medical about two weeks later and had the surgery on July 6, 2017. Tr. 679-83. The surgery was described as "effective;" Plaintiff's hospital course was described as "uneventful; and he was discharged from the hospital in stable condition on July 14, 2017. Tr. 641-42.

On the same day he was discharged, Plaintiff saw Sharyn Cass, ANP (Ms. Cass") at WNY Medical for a post-op follow-up. Tr. 673. He still had pain from his procedure, and he had several mental symptoms; he was alert and cooperative, but he was anxious, cantankerous, distrustful, irritable, and manic. Tr. 675. Plaintiff's insomnia, depression, and anxiety were noted to be "uncontrolled," and Plaintiff was instructed to seek psychological treatment. Tr. 676.

Follow-up appointments with Dr. Eckhert in mid and late August 2017 showed that Plaintiff was "doing very well." Tr. 632, 635. On August 21, 2017, Plaintiff was treated at the

Mercy Hospital of Buffalo ED for complaints of diarrhea and acid reflux, but doctors noted he had "essentially [a] completely normal workup," and he was released the same day. Tr. 649, 657.

Plaintiff went to WNY Medical a few days later, on August 24, 2017; he had anxiety and restlessness due to switching providers frequently. Tr. 665. His examination was normal, including normal mood. Tr. 666. His medications for anxiety were adjusted, but he was noted to be stable in terms of depression. Tr. 666. In September 2017, Plaintiff reported he had insomnia and depression, and he had contacted Lake Shore Behavioral Health Care but had not yet had an appointment. Tr. 623. Plaintiff's mood was normal, and his anxiety and depression were noted to be stable with medications. Tr. 625-26.

Meanwhile, by mid-September 2017, Dr. Eckhert noted that Plaintiff was "healthy appearing, well-nourished, and well-developed," and he was ambulating normally with no signs of distress. Tr. 591. His abdominal examination was normal as well. *Id*. Plaintiff returned again in October 2017, complaining of pain and difficulty walking. Tr. 610-11. Dr. Eckhert observed that Plaintiff was healing well, he could walk normally, and he continued to believe Plaintiff was doing "very well." Tr. 612.

Plaintiff returned to WNY Medical in early January 2018, where he was seen by Jill Ector, NP ("Ms. Ector"). Tr. 583. He reported soreness in his stomach and said he was taking Tylenol with some relief. Tr. 580. Plaintiff denied anxiety or depression, but he appeared anxious during his examination. Tr. 581-82. His anxiety and depression were noted to be "stable." Tr. 582-83.

Plaintiff was examined by Ashraf Henry, M.D. ("Dr. Henry"), on January 24, 2018, for complaints of back pain. Tr. 572-74. Upon examination, Plaintiff had normal mental status, and he had normal gait and station. Tr. 573. He had some reduced range of motion in his lower back, but his strength and muscle tone were normal. *Id*. He had positive SLR testing on both sides,

normal gait, and diminished sensation to pinprick in both legs. *Id*. Dr. Henry prescribed pain medication and advised Plaintiff to start physical therapy. Tr. 573.

As noted above, Plaintiff objects to the ALJ's physical and mental RFC, arguing that the ALJ's assessment was not supported by substantial evidence. Plaintiff first argues that his physical RFC was not based on substantial evidence because it did not sufficiently reflect the medical opinions the ALJ reviewed in her decision. *See* ECF No. 9-1 at 15-18. Plaintiff argues that "an ALJ who makes an RFC determination in the absence of supporting expert medical opinion has improperly substituted his or her own opinion for that of a physician, and committed legal error." *See id*. at 15-16. However, Plaintiff's position is not consistent with the agency's regulations or circuit law because it is the ALJ who has primary responsibility for formulating the RFC.

A claimant's RFC is the most he can still do despite his limitations and is assessed based on an evaluation of all relevant evidence in the record. *See* 20 C.F.R. §§ 404.1520(e), 404.945(a)(1), (a)(3); Social Security Ruling ("SSR") 96-8p, 61 Fed. Reg. 34,474-01 (July 2, 1996). At the hearing level, the ALJ has the responsibility of assessing the claimant's RFC. *See* 20 C.F.R. § 404.1546(c); SSR 96-5p, 61 Fed. Reg. 34,471-01 (July 2, 1996); *see also* 20 C.F.R. § 404.1527(d)(2) (stating the assessment of a claimant's RFC is reserved for the Commissioner). Determining a claimant's RFC is an issue reserved to the Commissioner, not a medical professional. *See* 20 C.F.R. § 416.927(d)(2) (indicating that "the final responsibility for deciding these issues [including RFC] is reserved to the Commissioner"); *Breinin v. Colvin*, No. 5:14-CV-01166(LEK TWD), 2015 WL 7749318, at *3 (N.D.N.Y. Oct. 15, 2015), *report and recommendation adopted*, 2015 WL 7738047 (N.D.N.Y. Dec. 1, 2015) ("It is the ALJ's job to determine a claimant's RFC, and not to simply agree with a physician's opinion.").

Moreover, the ALJ's conclusion need not "perfectly correspond with any of the opinions of medical sources cited in [her] decision," because the ALJ is "entitled to weigh all of the evidence

available to make an RFC finding that [i]s consistent with the record as a whole." *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) (citing *Richardson v. Perales*, 402 U.S. 389, 399 (1971) (the RFC need not correspond to any particular medical opinion; rather, the ALJ weighs and synthesizes all evidence available to render an RFC finding consistent with the record as a whole); *Castle v. Colvin*, No. 1:15-CV-00113 (MAT), 2017 WL 3939362, at *3 (W.D.N.Y. Sept. 8, 2017) (The fact that the ALJ's RFC assessment did not perfectly match a medical opinion is not grounds for remand.).

Contrary to Plaintiff's argument (*see* ECF No. 9-1 at 16), the ALJ adequately explained her reasons for the physical limitations in the RFC. The ALJ's decision reflects careful consideration of the "record as a whole" in assessing Plaintiff's subjective claims. *See Matta v. Astrue*, 508 F.App'x at 56 (the ALJ formulates residual functional capacity based on the "record as a whole."). The regulations also require the ALJ to consider the extent to which subjective complaints are consistent with other evidence in the record. *See generally* 20 C.F.R. §§ 416.929; 404.1529; SSR 16-3p, 2017 WL 5180304 (S.S.A.).

Here, the ALJ acknowledged Plaintiff's subjective description of his impairments, but she pointed to evidence that contradicted some of his claims. For instance, Plaintiff said his ability to lift and walk were restricted, but his strength ratings were essentially normal throughout the record, including from Plaintiff's treating pain physician, Dr. Siddiqui, and from his treating surgeon, Dr. Eckhart. Tr. 23, 373, 379, 394, 476, 591. Although Plaintiff had a slow and limping gait at times, consultative examiner Dr. Brauer observed that Plaintiff was able to get on and off the examining table without help; and during other times Plaintiff's gait was reported as normal. Tr. 23, 554, 556, 573. The ALJ also considered other factors suggesting Plaintiff's claims were not fully consistent with the evidence, including Plaintiff's failure to seek recommended physical therapy, and that Plaintiff reported that medications were effective in helping with his pain. Tr. 23-24.

Plaintiff's burden was to show no reasonable mind could have agreed with the ALJ's conclusions, which he has failed to do. The substantial evidence standard is "a very deferential standard of review – even more so than the 'clearly erroneous' standard," and the Commissioner's findings of fact must be upheld unless "a reasonable factfinder would *have to conclude* otherwise." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (emphasis in the original). As the Supreme Court explained in *Biestek v. Berryhill*, "whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high" and means only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

Rather than directly confronting or challenging the ALJ's findings, or the evidence that supported them, much of Plaintiff's argument instead contends that the ALJ did not sufficiently discuss the medical opinion forms completed by nurse practitioners Ms. Bixby and Ms. Wasner, who treated him at WNY Medical. *See* ECF No. 9-1 at 18-20 (citing Tr. 1071-74). As an initial matter, both Ms. Bixby and Ms. Wasner are "other medical sources," which are distinguished from acceptable medical sources like doctors and psychologists. *See* 20 C.F.R. §§ 404.1513(a), 416.913(a) (non-physician medical professionals like nurse practitioners and counselors are "other" medical sources to be distinguished from "acceptable" medical sources like physicians); SSR 06-3p, 2006 WL 2329939 (S.S.A.).[2] "[W]hile the ALJ is certainly free to consider the opinion of [non-acceptable medical sources] in making his overall assessment of a claimant's impairments and residual abilities, those opinions do not demand the same deference as those of a treating physician." *Genier v. Astrue*, 298 F. App'x 105, 108 (2d Cir. Nov. 5, 2008) (citing *Mongeur v.*

---

[2] The Commissioner has recently updated regulations pertaining to medical evidence, which included rescinding several Social Security Rulings, including 06-3p and 96-2p, effective March 27, 2017. *See* 82 Fed. Reg. 16,869 (April 6, 2017) (clarifying effective date of rescission notice published at 82 Fed. Reg. 15,263 (March 27, 2017)). However, because those changes are in effect only for cases filed after that date, they do not apply to this case.

*Heckler*, 722 F.2d at1039 n.2). An ALJ is "free to discount the assessments [of such sources] accordingly in favor of the objective findings of other medical doctors"); *see Saxon v. Astrue*, 781 F. Supp. 2d 92, 104 (N.D.N.Y. 2011) ("[T]he ALJ is empowered with the discretion to afford less than controlling weight, or even no weight, to the opinion of 'other sources,'" as long as she "address[es] and discuss[es] the opinion").

The ALJ's decision should, however, reflect consideration of the information from an "other" source so that a subsequent reviewer may follow the ALJ's reasoning. *See* 20 C.F.R. §§ 404.1513(a) & (d), 416.913(a) & (d). The ALJ did that in this case. Tr. 25. The ALJ explained that she assigned both opinions "partial weight because they are generally supported by the substantial evidence [showing] limiting, but not disabling, physical and mental impairments." Tr. 25. In addition, the ALJ cited to the evidence in the record supporting her assignment of partial weight to the two opinions. Tr. 25. The ALJ was not required to afford these opinions controlling weight, and her assignment of partial weight is supported by substantial evidence.

Plaintiff's complaint that the ALJ's RFC was not sufficiently consistent with the two nurse practitioners' opinions is likewise unavailing. *See* ECF No. 9-1 at 16-19. For instance, Plaintiff argues that it is impossible to understand the ALJ's sit/stand limitation in light of the two opinions; however, both Ms. Bixby and Ms. Wasner merely suggested "moderate" standing limitations generally, and neither of them suggested a sit/stand option at all. Tr. 1071-74. In fact, the ALJ's sit/stand limitation, as well as many of the other limitations in the ALJ's RFC, was even more limiting than those in the two opinions. Notably, both Ms. Bixby and Ms. Wasner opined that Plaintiff could lift up to twenty pounds, considerably more than the sedentary-level, ten-pound limit included in the ALJ's RFC. Tr. 21, 1072, 1074. *See* 20 C.F.R. §§ 404.1567(a); 416.967(a) (sedentary works involving lifting no more than ten pounds). As Plaintiff points out, the ALJ also

imposed additional restrictions to keep Plaintiff away from hazards like heights. *See* ECF No. 9-1 at 16 (citing Tr. 21).

As noted above, the RFC need not correspond to any particular medical opinion; rather, the ALJ weighs and synthesizes all evidence available to render an RFC finding consistent with the record as a whole. *Matta v. Astrue*, 508 F. App'x at 56. Furthermore, the ALJ is permitted to find a claimant more limited than has been suggested by a medical source. The "fact that the ALJ's RFC assessment did not perfectly match [an examining medical source]'s opinion, and was in fact more restrictive than that opinion, is not grounds for remand." *McLeod v. Berryhill*, Case No. 1:17-CV-00262, 2018 WL 4327814, at *3 (W.D.N.Y., Sept. 11, 2018) (citing *Castle v. Colvin*, No. 1:15-CV-00113, 2017 WL 3939362, at *3 (citations omitted); *Richardson v. Colvin*, No. 15-CV-6276 CJS, 2016 WL 3179902, at *8 (W.D.N.Y. June 8, 2016) (rejecting claimant's argument that the ALJ improperly substituted his opinion for competent medical opinion in determining claimant could perform light work; record contained examining physician's opinion that claimant has a "mild limitation" on lifting and carrying).

The ALJ also properly gave partial weight to Dr. Brauer's opinion that Plaintiff would have "moderate" limitations in his ability to stand, sit, push, pull, or carry heavy objects. Tr. 24. The ALJ explained that the opinion had not offered sufficient specificity, but that it was "generally supported by the medical evidence showing unremarkable musculoskeletal and gastrointestinal symptoms." Tr. 24. Consequently, the ALJ's RFC was consistent with the opinion. For instance, the RFC for a limited range of sedentary work was completely consistent with moderate limitations in the ability to stand, sit, push, pull, or carry heavy objects. Furthermore, Dr. Brauer's own examination findings were consistent with the ALJ's RFC finding. Dr. Brauer reported that Plaintiff had a slow gait, but he could get on and off the examining table; rise from a chair without difficulty; and he had normal range of motion, and normal strength. Tr. 555-56.

Although Plaintiff argues the ALJ was obligated to seek to recontact Dr. Brauer so that the doctor could offer further details regarding his opinion.  *See* ECF No. 9-1 at 18. Plaintiff is wrong. The ALJ only needs to seek additional evidence if the evidence is inconsistent and she is unable to render a decision based on the evidence available. *See* 20 C.F.R. §§ 404.1520b(b); 416.920b(b) ("If any of the evidence in your case record, including any medical opinion(s), is inconsistent, we will weigh the relevant evidence and see whether we can determine whether you are disabled based on the evidence we have."). Here, not only was the ALJ's decision consistent with Dr. Brauer's opinion, but the record reflects that the ALJ had adequate other evidence before her to make her decision. "Only if the ALJ cannot determine whether a claimant is disabled based upon existing evidence does the duty to recontact arise." *Ayers v. Astrue*, No. 08-CV-69A, 2009 WL 4571840, at *2 (W.D.N.Y. Dec. 7, 2009); *see also Micheli v. Astrue*, 501 F. App'x 26, 29 (2d Cir. 2012) ("[t]he mere fact that medical evidence is conflicting or internally inconsistent does not mean that an ALJ is required to re-contact a treating physician."); *Miller v. Comm'r of Soc. Sec.*, 2017 WL 4286295, *10 (N.D.N.Y. 2017) ("the presence of an evidentiary conflict does not categorically require the ALJ to seek further information[;] . . . it is the province of the ALJ to consider and resolve conflicts in the evidence as long as the decision rests upon adequate findings supported by evidence having rational probative force") (internal quotations omitted).

As noted above, the ALJ provided a detailed review of Plaintiff's treatment records, including the fact that Plaintiff retained normal strength and adequate gait throughout the time period under review. Because the ALJ had sufficient evidence to render a decision, there was no need for her to recontact Dr. Brauer. *See Johnson v. Colvin*, 669 F. App'x 44, 46 (2d Cir. 2016) (explaining that "because the record contained sufficient other evidence supporting the ALJ's determination and because the ALJ weighed all of that evidence when making his residual functional capacity finding, there was no 'gap' in the record and the ALJ did not rely on his own

'lay opinion'"). In sum, Plaintiff has failed to "show that no reasonable factfinder could have reached the ALJ's conclusions based on the evidence in the record." *Morris v. Berryhill*, No. 16-02672, 2018 WL 459678, at *3 (2d Cir. Jan. 18, 2018).

Plaintiff next argues that the ALJ's mental RFC did not reflect the opinion evidence. According to Plaintiff, "there is no explanation of the bases for the limitations the ALJ included in the RFC." *See* ECF No. 9-1 at 19. In particular, Plaintiff argues that the mental portion of the ALJ's mental RFC did not adequately reflect opinion evidence from Ms. Bixby and Ms. Wasner, or the opinion of the consulting psychologist, Dr. Ippolito. *Id*. Again, Plaintiff has not met his burden of showing the ALJ's findings were not supported by substantial evidence. The ALJ's analysis reflects careful consideration of the record, including Plaintiff's testimony, his treatment history, the medical opinion evidence, and his daily activities.

When a claimant allegedly suffers mental impairments, the ALJ is required to follow a "special technique" at each level of the administrative review process to determine whether the claimant has any severe mental impairments and whether the impairments meet or equal the Listings. 20 C.F.R. § 404.1520a. Specifically, the ALJ must assess the claimant's degree of functional limitation resulting from a mental impairment in four broad functional areas identified in Paragraph B of the adult mental disorders listings—activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation.. *See* 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3). Each domain is rated using a five-point scale—none, mild, moderate, marked and extreme. 20 C.F.R. § 404.1520a(c)(4). The ALJ's written decision must reflect application of the technique, including a specific finding as to the degree of limitation in each of the four functional areas. *Howard v. Comm'r of Soc. Sec.*, 203 F. Supp. 3d 282 (W.D.N.Y. 2016).

First, with respect to understanding, remembering, and applying information, the ALJ found that Plaintiff has a moderate limitation. Tr. 20. The ALJ noted that Plaintiff reported he is able to prepare quick meals, groom and dress himself, but he does not do chores or shop because his father handles those tasks.  Tr. 548. Additionally, the ALJ noted Dr. Ippolito's report indicating that Plaintiff was able to understand simple directions and instructions. Tr. 549.

Next, the ALJ found that Plaintiff has a moderate limitation in interacting with others. Tr. 20. The ALJ found that Plaintiff had clear social limitations at times—he could be "fussy and agitated" and he said he tended to self-isolate—but she also pointed out that he was consistently described as cooperative with his healthcare providers, and he could get along with others. Tr. 20, 23, 482, 494, 675. For example, Dr. Siddiqui observed that Plaintiff was pleasant and cooperative. Tr. 373. Dr. Ippolito reported that Plaintiff had normal social skills, was cooperative, and had adequate hygiene. Tr. 547.

With regard to concentrating, persisting, or maintaining pace, the ALJ found that Plaintiff has a moderate limitation. Tr. 20. There was evidence that Plaintiff had some limitations in his ability to concentrate, but as the ALJ found, the evidence suggested no more than a moderate limitation. Tr. 20. The ALJ noted that Dr. Ippolito found Plaintiff had some limitations in concentration in simple clinical testing, but her opinion was that Plaintiff could still perform simple work. Tr. 20, 548-49. The ALJ also pointed out that Plaintiff testified that he was able to take the bus alone to his hearing, suggesting he had adequate attention for simple mapping and pathfinding tasks. Tr. 20, 40.

As for the final domain, adapting or managing oneself, the ALJ found only a mild limitation.  This area of mental functioning refers to Plaintiff's abilities to regulate emotions, control behavior and maintain well-being in a work setting.  Despite being described as fussy or

agitated, as noted above, Plaintiff generally cooperated with his various healthcare providers and examiners. Tr. 20, 23, 482, 494, 675.

The ALJ's RFC is fully consistent with the findings above, as well as the report from Dr. Ippolito. After examining Plaintiff in person, Dr. Ippolito opined that Plaintiff could follow and understand simple directions and instructions; perform simple tasks independently; maintain a regular schedule; learn new tasks; perform complex tasks independently; and make appropriate decisions. Tr. 549. She also found that Plaintiff had no more than moderate limitations in three more areas—the ability to maintain attention and concentration, relate adequately with others, and appropriately deal with stress. Tr. 24, 549.

It is within the ALJ's authority to translate Plaintiff's "moderate" limitations into concrete work-related functional limitations. The mental demands of work require the ability to "understand, carry out, and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers and work situations; and deal with changes in a routine work setting." SSR 96-8p; 1996 WL 374184, *6 (S.S.A.); *see also* SSR 85-15, 1985 WL 56857, *4 (S.S.A.) (noting same abilities). Here, the ALJ's RFC reflected the mental demands of work from SSR 96-8p. Consistent with her analysis of the entire record, including Dr. Ippolito's findings, the ALJ properly determined that Plaintiff could perform simple, routine, repetitive tasks that did not require him to make many changes in his routine. Tr. 21.

Finally, Plaintiff argues that the ALJ overlooked the mental limitations in Ms. Bixby and Ms. Manser's opinion forms. *See* ECF No. 9-1 at 20. However, the ALJ explained her reasons for assigning the opinions only partial weight.  Tr. 24-25. First, as discussed above, the ALJ noted that, as nurse practitioners, Ms. Bixby and Ms. Manser were not acceptable medical sources. Tr. 24. The ALJ also explained that Ms. Bixby and Ms. Manser's statements that Plaintiff was "permanently" unable to lift more than 20 pounds and had postural and mental limitations (Tr.

1072, 1074) are not medical opinions but, rather, are administrative findings on an issue reserved to the Commissioner. Tr. 25. *See* 20 C.F.R. § 404.1527(d) (an opinion on the ultimate issue of disability is not a medical opinion, and is not entitled to any "special significance"); *Robson v. Astrue*, 526 F.3d 389, 393 (8th Cir. 2008); *House v. Astrue*, 500 F.3d 741, 745 (8th Cir. 2007) ("A treating physician's opinion that a claimant is disabled or cannot be gainfully employed gets no deference because it invades the province of the Commissioner to make the ultimate disability determination."). However, the ALJ also noted the opinions were given partial weight because they were generally supported by other evidence showing limiting, but not disabling, physical and mental impairments. Tr. 25.

While Plaintiff may disagree with the ALJ's conclusion, the Court must "defer to the Commissioner's resolution of conflicting evidence" and reject the ALJ's findings "only if a reasonable factfinder would have to conclude otherwise." *Morris v. Berryhill*, No. 16-02672, 2018 WL 459678, at *3 (internal citations and quotations omitted); *Krull v. Colvin*, 669 F. App'x 31 (2d Cir. 2016) (the deferential standard of review prevents a court from reweighing evidence); *Bonet ex rel. T.B. v. Colvin*, 523 F. App'x 58, 59 (2d Cir. 2013) (summary order) ("Under this very deferential standard of review, once an ALJ finds facts, we can reject those facts only if a reasonable factfinder would have to conclude otherwise."). Further, it is the ALJ's duty to evaluate conflicts in the evidence. *See* 20 C.F.R. § 404.1527(c)(i); *Brault v. Soc. Sec. Admin. Comm'r*, 683 F.3d at 448 ("Once the ALJ finds facts, [the Court] can reject those facts only if a reasonable factfinder would have to conclude otherwise"); *Monroe v. Comm'r of Soc. Sec.*, 676 F. App'x 5, 7 (2d Cir. 2017) ("Genuine conflicts in the medical evidence are for the Commissioner to resolve.") (quoting *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002)).

For all the reasons discussed above, the Court finds that the ALJ properly considered the record as a whole, including Plaintiff's testimony, his daily activities, his treatment history, and

the medical opinion evidence, and those findings are supported by substantial evidence. Accordingly, the Court finds no error.

## CONCLUSION

Plaintiff's Motion for Judgment on the Pleadings (ECF No. 9) is **DENIED**, and the Commissioner's Motion for Judgment on the Pleadings (ECF No. 11) is **GRANTED**. Plaintiff's Complaint (ECF No. 1) is **DISMISSED WITH PREJUDICE**. The Clerk of Court will enter judgment and close this case.

**IT IS SO ORDERED**.


DON D. BUSH
UNITED STATES MAGISTRATE JUDGE